**THIRD DIVISION
DOYLE, P. J.,
REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**July 14, 2022**

# In the Court of Appeals of Georgia

A22A0833. AUGUSTIN et al. v. WALKER LAKE EMERGENCY GROUP, PC.

PHIPPS, Senior Appellate Judge.

The plaintiffs in this action for breach of contract and related claims appeal from the trial court's order granting summary judgment to the defendant. The plaintiffs contend that: (i) the trial court erred by construing the contracts at issue here to permit the defendant to retaliate against them; (ii) the implied covenant of good faith and fair dealing barred the defendant from terminating the contracts for retaliatory reasons; and (iii) the trial court ignored substantial evidence of retaliation in rendering its decision. For the reasons that follow, we discern no reversible errors and affirm the trial court's judgment.

Plaintiffs Brooke Augustin, M.D., and Robin Lowman White, M.D., are emergency room physicians who operate through their companies, plaintiffs Brooke Augustin, M.D., P.C., and Smith Lowman, LLC (together with Drs. Augustin and White, the "Plaintiffs"). Defendant Walker Lake Emergency Group, PC, an affiliate of SCP Health, f/k/a Schumacher Clinical Partners ("Walker Lake"),[1] provides emergency medicine physicians and clinical solutions to hospitals and, as relevant here, provides emergency department personnel to Piedmont Rockdale Hospital ("Piedmont Rockdale").

In 2019, Dr. Augustin (through her company) entered into a Provider Agreement with Walker Lake, pursuant to which Walker Lake engaged Dr. Augustin as an independent contractor to provide clinical services to Piedmont Rockdale. Dr. White (also through her company) entered into a materially identical Provider Agreement with Walker Lake that same year. As relevant here, the Provider Agreements contain the following termination provisions:

---

[1] Throughout the proceedings, the parties at times use the names "Walker Lake," "Schumacher," and "SCP" interchangeably to refer to the defendant. For consistency, we use the term "Walker Lake" in this opinion.

7. ***Termination.***

a. This Agreement shall be subject to termination without cause by either party giving not less than ninety (90) days prior written notice to the other party specifying the date of termination. . . .

b. Company may also terminate this Agreement immediately, and without written notice, in the event that: . . . (v) Hospital Administration requests the removal of Physician or reports that Physician is being disruptive, unprofessional, or unreasonably uncooperative with the medical or administrative staff of Hospital . . . .[2]

By their terms, the Provider Agreements automatically renewed each year, and the parties do not dispute that they were in effect when the events giving rise to this lawsuit occurred.

On February 26, 2020, Walker Lake terminated Dr. Augustin's Provider Agreement effective 90 days after March 1, 2020. On March 17, 2020, Piedmont Rockdale's chief financial officer ("CFO") asked Walker Lake to permanently remove Dr. White as a provider at Piedmont Rockdale; Dr. White learned of her dismissal on April 1, 2020.

---

[2] The Provider Agreements define "Company" as Walker Lake and "Hospital" as Piedmont Rockdale.

The Plaintiffs thereafter sued Walker Lake for breach of contract and breach of the covenant of good faith and fair dealing.[3] They alleged that, by terminating their contracts, Walker Lake "breached expressed and implied terms in the Provider Agreements that protected the Plaintiffs from retaliation and termination for reporting patient safety concerns and for reporting that a fellow [Walker Lake] physician was treating patients while impaired." The Plaintiffs further asserted that, because their terminations were "in bad faith," the terminations violated the implied covenant of good faith and fair dealing.

Following discovery, Walker Lake moved for summary judgment on grounds that: (i) it substantially complied with the termination provisions in the Provider Agreements; and (ii) "[t]here can be no breach of the implied covenant of good faith and fair dealing when a party undertakes an action which is explicitly provided for in an agreement." The trial court granted Walker Lake's motion, concluding, in relevant part, that Walker Lake properly exercised its contractual rights when it terminated the Provider Agreements. This appeal followed.

---

[3] The Plaintiffs also raised claims for intentional breach of contract and attorney fees and expenses. On appeal, they do not challenge the trial court's grant of summary judgment to Walker Lake on those claims.

We review de novo a grant or denial of summary judgment, viewing the evidence and all reasonable conclusions and inferences drawn from it in the light most favorable to the nonmovant. *City of St. Marys v. Reed*, 346 Ga. App. 508, 508-509 (816 SE2d 471) (2018). Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Id. at 508; see OCGA § 9-11-56 (c). "[T]he burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case." *Ellison v. Burger King Corp.*, 294 Ga. App. 814, 819 (3) (a) (670 SE2d 469) (2008) (citation and punctuation omitted); see OCGA § 9-11-56 (c). If the movant meets this burden, the nonmovants "cannot rest on [their] pleadings, but rather must point to specific evidence giving rise to a triable issue." *Ellison*, 294 Ga. App. at 819 (3) (a) (citation and punctuation omitted); see OCGA § 9-11-56 (e).

1. On appeal, the Plaintiffs contend that the trial court erred by construing the Provider Agreements to permit Walker Lake to retaliate against them for reporting safety issues. According to the Plaintiffs, the Provider Agreements incorporate a Code of Conduct that prohibits retaliation against personnel who report patient safety

5

concerns, as both Plaintiffs claim they did before their contracts were terminated.[4] We discern no error in the trial court's ruling.

The construction of a contract is a question of law that this Court reviews de novo. *McKinley v. Coliseum Health Group*, 308 Ga. App. 768, 770 (1) (708 SE2d 682) (2011). "The cardinal rule of contract construction is to determine the intent of the parties as expressed within the four corners of the written agreement." *Yargus v. Smith*, 254 Ga. App. 338, 341 (562 SE2d 371) (2002). This involves three steps:

> First, the trial court must decide whether the contract language is clear and unambiguous. If it is, the trial court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

---

[4] The trial court found that there is no evidence that Walker Lake retaliated against the Plaintiffs. Because, as discussed below, Walker Lake acted within its authority under the Provider Agreements when it terminated the Plaintiffs' contracts regardless of any potential retaliatory motive, we need not address — and therefore express no opinion on — the trial court's rulings as to evidence of retaliation. See Divisions 2 and 3, below.

*McKinley*, 308 Ga. App. at 770 (1) (citation and punctuation omitted). "[W]here the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties," *Azzouz v. Prime Pediatrics*, 296 Ga. App. 602, 607 (3) (675 SE2d 314) (2009) (citation and punctuation omitted), giving the contract's terms "an interpretation of ordinary significance," *Fernandes v. Manugistics Atlanta*, 261 Ga. App. 429, 433 (1) (582 SE2d 499) (2003) (citation and punctuation omitted).

Here, paragraph (3) (k) of the Provider Agreements states, in relevant part:

Provider[5] understands that Company and Hospital have adopted a compliance program (of which a Code of Conduct is an integral part) and acknowledges that the duties, responsibilities, and policies described by the compliance program(s) apply equally to the Company's and Hospital's independent contractors. Provider acknowledges, agrees and warrants that Physician will abide by the terms of these compliance programs, including completion of all required initial and annual compliance training, and will report to Company any known or suspected violations of said compliance programs. Provider acknowledges and understands that the Company may terminate this Agreement immediately or take other disciplinary action in the event

---

[5] The Provider Agreements define "Provider" as each individual plaintiff's company.

7

that Provider or Physician violates any provision of the Company's or Hospital's compliance programs.

Notably, the above provision appears under a heading entitled "***Obligations of Provider***" and does not appear under a separate heading entitled "***Obligations of Company***." Pretermitting whether paragraph (3) (k) "incorporates" the Code of Conduct to which it refers, the paragraph by its plain, unambiguous terms imposes obligations only on the "Provider" and "Physician" (i.e., the Plaintiffs) and not on the "Company" (i.e., Walker Lake), a reading that is further supported by the headings under which the paragraph does and does not appear.

Nevertheless, the Plaintiffs maintain that paragraph (3) (k) must be read together with two other paragraphs that: (i) require a physician to inform Walker Lake or hospital personnel if the physician (a) becomes impaired or is concerned that she will become impaired or (b) is unable to obtain adequate rest and recuperation before a work shift; (ii) declare that "the medical care of emergency department patients shall have greatest priority"; and (iii) require a physician to inform Walker Lake or hospital personnel promptly if she "is unable to resolve any conflict immediately." Nothing about those provisions, however, reasonably may be read to change the plain meaning of paragraph (3) (k) or otherwise operate to impose *on Walker Lake — as*

8

*part of the Provider Agreements* — any obligations that may be included in the Code of Conduct.

Finally, while the Plaintiffs rely on the deposition testimony of a Walker Lake representative to the effect that the Code of Conduct imposes obligations on Walker Lake, that reliance is misplaced. Because the termination provisions in the Provider Agreements are unambiguous, extrinsic evidence has no bearing on their interpretation. See *Yash Solutions v. New York Global Consultants Corp.*, 352 Ga. App. 127, 141 (2) (b) (834 SE2d 126) (2019) (where no ambiguity exists, a contract "will be enforced according to its plain terms," and a court may not "consider surrounding circumstances or parol evidence") (citations and punctuation omitted); *Extremity Healthcare v. Access to Care America*, 339 Ga. App. 246, 254 (1) (793 SE2d 529) (2016) (parol, or extrinsic, evidence "cannot be used to contradict or vary the terms of a valid written agreement"); accord *Azzouz*, 296 Ga. App. at 607 (3). For each of the above reasons, this enumeration of error provides no basis to call into question the trial court's judgment.

2. The Plaintiffs alternatively contend that the implied covenant of good faith and fair dealing bars Walker Lake from terminating their contracts as retaliation for their complaints about patient safety. According to the Plaintiffs, because the

9

Provider Agreements "do not give Walker Lake sole, absolute or uncontrolled discretion to terminate," Walker Lake was "required to use good faith in exercising those termination rights," which it did not do when it terminated the Plaintiffs as retaliation for raising patient-safety issues. We disagree.

> [E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. . . . [T]his implied duty requires both parties to a contract to perform their promises and provide such cooperation as is required for the other party's performance. And, where the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.

*Hunting Aircraft v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 451-452 (1) (636 SE2d 139) (2006) (citations, punctuation, and emphasis omitted).

Importantly, "[t]he implied covenant modifies and becomes a part of the provisions of the contract, but the covenant cannot be breached apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability." *Wanna v. Navicent Health*, 357 Ga. App. 140, 153 (3) (850 SE2d 191) (2020) (citations and punctuation omitted). Thus, "there can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." Id. (citation and

10

punctuation omitted); accord *Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 96-97 (2) (b) (718 SE2d 35) (2011); see also generally *Hunting Aircraft*, 281 Ga. App. at 453 (2) ("If an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision."). Put another way, "[t]here is no independent cause of action for violation of a duty of good faith and fair dealing in the performance of a contract apart from breach of an express term of the contract." *Bankston v. RES-GA Twelve*, 334 Ga. App. 302, 304 (2) (779 SE2d 80) (2015) (citation and punctuation omitted).

Here, the unambiguous terms of the Provider Agreements expressly gave Walker Lake the authority to terminate the agreements: (i) without cause (i.e., for any reason) by giving 90 days' written notice; and (ii) immediately, if "Hospital Administration requests the removal of Physician." Walker Lake therefore acted within the authority granted to it under the Provider Agreements when it: (i) terminated Dr. Augustin's agreement by giving her 90 days' written notice; and (ii) terminated Dr. White's agreement immediately when requested to do so by Piedmont Rockdale's CFO.[6] And because Walker Lake did not breach the express

---

[6] The Plaintiffs do not dispute that Piedmont Rockdale's CFO is a member of the hospital's "[a]dministration" for purposes of the Provider Agreements. In fact,

11

terms of the Provider Agreements when it terminated the agreements as it did, the implied covenant of good faith and fair dealing does not provide an independent basis for liability against it.[7] See *Wanna*, 357 Ga. App. at 153 (3); *Bankston*, 334 Ga. App. at 304 (2); *Griffin*, 312 Ga. App. at 96 (2) (b); *Hunting Aircraft*, 281 Ga. App. at 453 (2). Consequently, this enumeration of error also provides no basis to call into question the trial court's judgment.

3. Finally, the Plaintiffs claim that the trial court ignored substantial evidence that Walker Lake retaliated against them by terminating their contracts. Whether an intent to retaliate against either plaintiff played any role in Walker Lake's decision, however, does not change the fact that, for the reasons stated above in Divisions 1 and 2, the Provider Agreements expressly authorized Walker Lake to terminate the Plaintiffs' contracts as it did. See generally *Ga. Power Co. v. Busbin*, 242 Ga. 612, 613 (1) (250 SE2d 442) (1978) (where employment is terminable at will by either party, it "gives rise to no cause of action against the employer for alleged wrongful

Dr. White agreed during her deposition that "hospital administration" requested her removal.

[7] For this reason, the Plaintiffs' repeated assertions that enforcing the Provider Agreements as written would allow Walker Lake to "take advantage of its own wrong" assumes that which it seeks to establish, i.e., that Walker Lake committed a "wrong" by breaching the Provider Agreements.

12

termination"); id. at 614 (3) (where one's employment is terminable at will, "allegations and evidence as to improper motives for [one's] discharge are legally irrelevant"); *Martin v. Hamilton State Bank*, 314 Ga. App. 334, 335-337 (723 SE2d 726) (2012) (a bank's "motivation" in choosing between alternative legal remedies available to it in the event of a borrower's default was immaterial in an action by the bank to recover an indebtedness); *Gunn v. Hawaiian Airlines*, 162 Ga. App. 474, 474 (291 SE2d 779) (1982) (rejecting the appellant's claim that "a good faith requirement implicit in all contracts" and "public policy" require "that employers be made to answer for unfair termination of employment" where the employer has the right to discharge the employee without cause). This enumeration of error thus provides nothing for us to review.[8]

*Judgment affirmed. Doyle, P. J., and Reese, J., concur*.

---

[8] Before the trial court, the Plaintiffs raised several arguments regarding prohibitions on retaliation under the Georgia Whistleblower Act, OCGA § 45-1-4, and Title VII of the Civil Rights Act of 1964, 42 USC § 2000e et seq. They raise no such claims on appeal, and we therefore express no opinion on the applicability of any such claims to the issues presented here.